<u>NOT FOR PUBLICATION</u>

<u>UNITED STATES DISTRICT COURT</u>
<u>FOR THE DISTRICT OF NEW JERSEY</u>

_____
                                        :
ESQUIRE DEPOSITION SERVICES, LLC :
                                        :
                Plaintiff,              :
                                        :        Civil Action No. 09-1526 (JAG)
        v.                              :
                                        :                **OPINION**
MICHAEL BOUTOT and THE MCS              :
GROUP, INC.,                            :
                                        :
                Defendants.             :
_____ :

<u>**GREENAWAY, JR., U.S.D.J.**</u>

        This matter comes before this Court on the application of plaintiff, Esquire Deposition

Services, LLC ("Plaintiff" or "Esquire"), seeking a preliminary injunction against defendants

Michael Boutot ("Boutot"), and The MCS Group, Inc., ("MCS") (collectively "Defendants").

For the reasons stated below, Plaintiff's application is granted.

**I. FACTS**

**A.      The Parties**

        Esquire is a limited liability company, organized under the laws of the State of Delaware,

with offices in Florham Park, New Jersey, and Woodbridge, New Jersey.  (Verified Complaint at

¶ 5.)  Esquire specializes in providing nationwide court reporting and related litigation support

services.  (<u>Id.</u>)  Defendant Michael Boutot, an individual residing in Mississippi, was formerly

employed by Esquire, and is currently employed by MCS.  (<u>Id.</u> at ¶ 6.)  Defendant MCS is a

1

corporation organized under the laws of the State of Pennsylvania, with its principal place of business in Philadelphia, Pennsylvania.  (Id. at ¶ 7.)  MCS also has an office in Newark, New Jersey.  (Id.)

According to the Verified Complaint, MCS hired Boutot, in or about November 2008, to create a new division for MCS, and to engage MCS in direct competition with Esquire, in the field of court reporting and other litigation support services for law firms and in-house legal departments throughout the country, including New Jersey.  (Id.)

Esquire bills itself as "the leading provider of local court reporting and other litigation support services in the United States . . . trusted by more law firms and in-house legal departments than any other legal support services company."  (Id. at ¶ 11.)  To that end, Esquire claims that it has "expended substantial amounts of time and money to build a national infrastructure with integrated technology and a network of court reporters to support the deposition and related litigation service needs of its customers and prospective customers."  (Id.)

Boutot, for his part, has enjoyed a lengthy career in the field of claims litigation, legal cost containment, and litigation management.  (Id. at ¶ 12.)  Prior to his employment with Esquire, Boutot was the director of litigation management for a major insurance company, and served as a sales and marketing executive for a number of claims litigation companies.  (Id.)

**B.     Michael Boutot's Relationship with Esquire**

On February 13, 2006, Esquire and Boutot entered into an Employment and Confidentiality Agreement ("Agreement"), pursuant to which Esquire employed Boutot as its Director of Business Development.  (Id. at ¶ 13; see Exhibit A to the Verified Complaint.) According to the terms of the Agreement, the employment arrangement between Esquire and

Boutot was to continue indefinitely, unless either party provided the other with two-weeks notice of intent to terminate the relationship.  (Id.)

The Agreement contains a "Covenant of Non-Solicitation," which Esquire contends prohibits Boutot "from directly or indirectly contacting Esquire's clients, customers or business contacts for a period of twelve (12) months following the termination of his employment with Esquire."[1]  (Verified Complaint at ¶ 14.)  The Agreement, Esquire contends, "also prohibits Boutot from disclosing Esquire's Confidential Information and Trade Secrets."[2]  (Id. at ¶ 15.)

_____

[1]Specifically, the Agreement provides as follows:

> Employee agrees that during the term of your employment by Esquire, other than in the proper performance of your employment duties for Esquire, and for a period of twelve (12) months after your employment terminates for any reason, you shall not directly or indirectly:
>
> > (i) solicit or contact, whether on your own behalf or on behalf of any other person or entity, any client or customer of Esquire who was a client or customer at any time during the 365 days immediately preceding termination of your employment, for the purpose of diverting or attempting to divert from Esquire any business, to do business with any of said clients or customers, to harm Esquire's relationship with any of said clients or customers or to cause any of said clients or customers not to do or otherwise reduce business with Esquire.
>
> > (ii) solicit, contact, retain, employ, recruit or attempt to recruit, whether on your own behalf or on behalf of any other person or entity, any consultant, independent contractor, videographer, reporter, referral source, agent or employee of Esquire (hereinafter a "Contact"), who was a Contact at any time during the 365 days immediately preceding termination of your employment.

(Exhibit A, attached to the Verified Complaint, at ¶ 4.)

[2]"Confidential Information and Trade Secrets" are defined under the Agreement as:

> (i) The business affairs, financial information, forms, manuals,

Esquire further alleges that pursuant to a non-compete clause embodied in the Agreement, Boutot

is prohibited from working for any Esquire competitor within a twenty-five mile radius of any

Esquire offices, areas, or territories, to which Boutot was assigned, for a period of six (6) months

following the termination of his employment with Esquire.  (Exhibit A, attached to the Verified

_____

Cont.

management, marketing techniques and programs, systems and methods of operation
which Esquire owns, plans or develops for its own use or for use by or with its clients;

      (ii) confidential information concerning Esquire's clients, be they past,
      present or prospective clients; and

      (iii) confidential information concerning Esquire's employees,
      videographers or court reporters, be they temporary, independent
      contractors or in-house staff.

      (Exhibit A, attached to the Verified Complaint, at ¶ 3.)

      With respect to the prohibition against improperly using or disclosing "Confidential
Information," the Agreement provides, in relevant part, that:

      Employee acknowledges that all of the Confidential Information was
      acquired at great expense and provides Esquire with a competitive
      advantage and is not readily available except to employees of Esquire in
      the normal course of business. Employee acknowledges that Confidential
      Information of Esquire is owned and shall continue to be owned solely by
      Esquire.  Employee agrees never to use or to disclose or furnish any
      Confidential Information to anyone for any purpose whatsoever except in
      the proper performance of their employment duties for Esquire.  Upon
      termination of employment or upon request at any time by Esquire, all
      books records, documents, advertising materials, manuals, supplies, client
      and employee lists, potential employee lists and database(s) and all other
      repositories containing Confidential Information or any other business
      information including any and all copies thereof, then in Employee's
      possession, custody, or control, whether prepared by Employee or others,
      shall be forthwith surrendered to Esquire by Employee.

      (Id.)

4

Complaint, at ¶ 5.)[3]

As Director of Business Development, Boutot was responsible for managing existing accounts in Esquire's Corporate Services Division, and for cultivating new business opportunities for the division.  (Id. at ¶ 19.)   Additionally, Boutot participated in creating and developing Esquire's national network of preferred provider court reporters ("PPN reporters"). (Id.)  To that end, Esquire, with the assistance of Boutot, developed a review process, through which it selected high-quality court reporters for inclusion in its national network.  (Id.)

Esquire alleges that "[a]s a result of performing these and his other job duties at Esquire, Boutot became intimately familiar with highly confidential and trade secret information of Esquire," and that "[t]his information derives economic value from not being generally known and is the subject of reasonable efforts to maintain its confidentiality by, among other means, requiring employees to execute confidentiality agreements such as the one executed by Boutot." (Id. at ¶ 20.)[4]

_____

[3]Specifically, the Agreement's "Covenant Not to Compete" states:

> Employee agrees that during the term of your employment hereunder and for a period of six (6) months after your employment terminates with Esquire for any reason, Employee will not, without the prior written consent of Esquire, engage directly or indirectly in any business (either financially or as a shareholder, employee, officer, partner, independent contractor, owner or in any other capacity calling for the rendition of personal services or acts of management, operation or control) which is competitive with the business of Esquire within a twenty-five (25) mile radius of any or the Esquire offices for or through which Employee provides or provided services for Esquire and/or any area, territory or office to which Employee is or was assigned.

[4]Esquire explains that such highly confidential and trade secret information includes, but is not limited to,

> confidential and difficult to develop information about Esquire's customers,

5

According to Esquire, in or about early November 2008, Boutot spoke with the then General Manager of Esquire's Corporate Services Division, Michael S. Saltman, and confided in Mr. Saltman that he was contemplating leaving Esquire because he was unhappy with his compensation.  (Id. at ¶ 22.)  On or about November 10, 2008, Boutot tendered his resignation, effective November 21, 2008.  (Id. at ¶ 23.)  Upon announcing his resignation, Boutot also informed Mr. Saltman that he would begin work as a consultant for the Council on Litigation Management ("CLM"), a non-profit organization committed to increasing standards in the field of litigation management.  (Id.)  On November 12, 2008 CLM announced that Boutot would serve as a consultant for CLM effective December 1, 2008.  (Id. at ¶ 24.)  Throughout his employment with Esquire, Boutot had served as President and Chairman of the Advisory Board of CLM.  (Id.)

**C.      Michael Boutot's Relationship with MCS**

At some point in early November 2008, Boutot and a senior MCS representative met to discuss employment opportunities with MCS.  (Exhibit C at 50:25-51:6, attached to the Supplemental Certification of Vincent N. Avallone ("Avallone Cert.").)  The talks resulted in MCS extending an offer of employment to Boutot.  (Id. at 51:4-6.)  On or about November 10, 2008, Boutot informed MCS of the Agreement with Esquire.  (Exhibit C at 54:25-55:3, attached

---

Cont.

  prospective customers, court reporters and providers; Esquire's business development plans, price structures and costs; the terms of Esquire's agreements with its customers, reporters and providers; and Esquire's marketplace strategies for competing with companies in the court reporting and litigation support services business.

  (Id. at ¶ 20.)

to the Avallone Cert.)  Notwithstanding the existence of the Agreement, on November 24, 2008,

Boutot began working for MCS, an admitted competitor of Esquire, as the Executive Vice

President - Deposition Services Division.  (Exhibit A & Exhibit C at 20:25, 33:16-25, attached to

Avallone Cert.)

    Numerous e-mails from Boutot to potential clients and others show that MCS  hired

Boutot to expand its fledgling court reporting division into a national enterprise.[5]  (Exhibit B,

attached to Avallone Cert.)

**D.     The Alleged Unlawful and Tortious Behavior**

    The Complaint alleges that MCS and Boutot entered into an agreement for Boutot to

leave Esquire, to create a court reporting division for MCS, and to engage MCS in direct

competition with Esquire.  (Id. at ¶ 31.)[6]  Esquire alleges that MCS operated for nearly thirty

years without offering court reporting services, and that MCS only began to offer such services

after hiring Boutot.  (Id. at ¶ 45.)

    In connection with this scheme, Esquire contends that on November 13, 2008, while

Boutot was still employed by Esquire but after he had announced his intention to resign, he

copied hundreds of Esquire's electronically stored data files and shared those confidential files

with MCS, in violation of the Agreement.  (Id. at ¶¶ 26, 29, and 44.)  Boutot further effectuated

the scheme, in part, by taking on the CLM consulting position, which afforded him unfettered

access to Esquire customers, prospective customers, and PPN reporters, yet did not raise

_____

    [5]According to Boutot, he was "brought on to establish a court reporting division."
(Exhibit B, attached to Avallone Cert.)

    [6]The Verified Complaint further alleges that MCS had knowledge of the Agreement, and
Boutot's obligations under the Agreement.  (Id. at ¶ 84.)

suspicion about his compliance with the Agreement.  (Id.)  Esquire contends that Boutot used his CLM position to solicit business on behalf of MCS improperly and secretly, in direct competition with Esquire.  (Id.)

Esquire eventually became aware of some arrangement between Boutot and MSC after an Esquire customer inquired whether Boutot had begun his employment with MSC.  (Id. at ¶ 33.)  Thereafter, Esquire inquired of CLM whether CLM knew of Boutot's employment with MCS.  (Id.)  According to Esquire, CLM "was shocked at learning of Boutot's new employment, believing (as had Esquire) that Boutot would work exclusively as a consultant for CLM."  (Id.)

On February 11, 2009, CLM announced that Boutot would no longer serve as President and Chairman of CLM's Advisory Board.  (Id. at ¶ 34.)  Nevertheless, Boutot requested and obtained the e-mail addresses of the attendees of a then-forthcoming CLM annual conference.  (Id.)  Boutot obtained these e-mail addresses, stating an intention to send thank-you notes to CLM members.  (Id. at ¶ 35.)  Esquire asserts that Boutot used these addresses to promote a roundtable discussion he would conduct during the conference to solicit customers for MCS.  (Id.)

CLM originally intended to sponsor Boutot's roundtable.  (Id. at ¶ 36.)  After a discussion with an Esquire representative about Boutot's employment at MCS, CLM discovered solicitation goals of the discussion and revoked its sponsorship and removed reference to Boutot's presentation from the conference brochure.  (Id. at ¶¶ 33, 36.)  Esquire claims that Boutot, nevertheless, persisted in creating the appearance of CLM sponsorship, by e-mailing CLM members, several of whom were Esquire customers, and inviting them to participate in the roundtable discussion.  (Id. at ¶ 39; see Exhibit B, attached to the Verified Complaint.)  Esquire

asserts that "Boutot continued the illusion of CLM's sponsorship of his court reporting services presentation when he donned a shirt with CLM's insignia and used a CLM PowerPoint presentation during the March 12, 2009 roundtable discussion." (Id. at ¶ 38.)  During the discussion, Esquire alleges, Boutot made disparaging remarks about national court reporting service providers, which caused Esquire customers to question Esquire's billing practices. (Id. at ¶ 40.)

Finally, before and during the conference, Boutot allegedly solicited court reporters to become "Charter Members" for MCS, with the expectation of developing a national preferred provider network of court reporters, akin to the group he assisted in developing at Esquire. (Id. at ¶ 41.)  Specifically, Boutot allegedly solicited at least nine (9) reporters at the conference, eight (8) of whom were Esquire PPN reporters. (Id.)  Boutot asked these reporters to sign non-disclosure agreements, in accordance with the solicitation. (Id.; see Exhibit D, attached to Verified Complaint.)

## II. PROCEDURAL POSTURE

On April 2, 2009, Esquire filed its Verified Complaint with this Court.  The Verified Complaint seeks immediate entry of an order enjoining Defendants and restraining them from engaging in solicitation and competition in violation of the Agreement, and from further disclosing Esquire's confidential information and trade secrets.[7]  (See Docket Entry No. 3.)

---

[7]Specifically, Esquire sought and obtained the issuance of a temporary restraining order, restricting Boutot from:

> (a) Violating, or participating in the violation of, any of the terms of the February 13, 2006 Employment and Confidentiality Agreement...
>
> (b) Soliciting or contacting any current clients or customers of Esquire in

Boutot and MCS's aforementioned conduct, Esquire asserts, constitutes tortious behavior in

────────────────────

Cont.

        an effort to solicit business or diverting [sic] business from Esquire;

        (c) Soliciting, contacting, retaining, employing, recruiting, or attempting to recruit any Esquire Contact (as defined in the Agreement);

        (d) Continuing to disclose, transfer and convey any Confidential Information and/or Trade Secret...

        (e) Destroying any electronic or hard copy document...that he obtained from or by virtue of his employment with Esquire...

        (f) Engaging in activities which are competitive with the business of Esquire in any location of the United States.

Esquire further sought and obtained the issuance of a temporary restraining order, restricting MCS from:

        (a) Engaging in or advertising or selling or marketing court reporting services at any location in the United States except that it may continue to provide court reporting services in Texas to clients that were clients of MSC (sic) as of June 1, 2008;

        (b) Encouraging, facilitating, or participating in Boutot's violation of any of the terms of the Agreement;

        (c) Encouraging or directly or indirectly using Boutot to contact any client or customer of Esquire in an effort to solicit business or diverting [sic] business from Esquire;

        (d) Encouraging or directly or indirectly using Boutot to solicit, contact, retain, employ, recruit, or attempt to recruit any Esquire Contact (as defined in the Agreement);

        (e) Using any Confidential Information or Trade Secrets obtained from Esquire by Boutot and provided to MCS in violation of the Agreement.

This Court's Order, dated April 2, 2009, reflects the temporary imposition of the aforementioned restraints, by consent, in place until a hearing on Plaintiff's preliminary injunction application could be heard.  (Docket Entry No. 3.)

violation of the Agreement and other common law contract principles.  As a result, the Verified

Complaint prays for injunctive relief, and alleges causes of action for breach of contract (Count

II), breach of duty of loyalty (Count III), misappropriation of confidential information and trade

secrets (Count IV), tortious interference with business relations/economic advantage (Count V),

and tortious interference with contract (Count VI).

Following this Court's imposition of temporary restraints (see supra n. 7), the preliminary

injunction issue was fully briefed, and this Court heard oral argument on the matter on May 28,

2009.  This Court reserved ruling on Plaintiff's application for a preliminary injunction, and now

considers that application.

Jurisdiction is proper, pursuant to this Court's diversity jurisdiction under  28 U.S.C. §

1332(a).  Plaintiff's and Defendants' citizenship is diverse, and the amount in controversy

exceeds $75,000.00.

### III. STANDARD OF REVIEW

"[T]he grant of injunctive relief is an 'extraordinary remedy, which should be granted

only in limited circumstances.'"  Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797,

800 (3d Cir. 1989) (citing Frank's GMC Truck Ctr. Inc. v. Gen. Motors Corp., 847 F.2d 100, 102

(3d Cir. 1988)).  Generally, in determining whether to grant a preliminary injunction or a

temporary restraining order, courts consider four factors:

> (1) the likelihood that the applicant will prevail on the merits at final hearing; (2)
> the extent to which the plaintiffs are being irreparably harmed by the conduct
> complained of; (3) the extent to which the defendants will suffer irreparable harm
> if the preliminary injunction is issued; and (4) the public interest.

S & R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 374 (3d Cir. 1992) (citing Hoxworth v.

Blinder, Robinson & Co., 903 F.2d 186, 197-98 (3d Cir. 1990)).  "[W]hile the burden rests upon the moving party to make [the first] two requisite showings, the district court" should look to factors three and four when relevant.  Acierno v. New Castle County, 40 F.3d 645, 653 (3d Cir. 1994).  "All four factors should favor preliminary relief before the injunction will issue." S & R Corp., 968 F.2d at 374 (citing Hoxworth, 903 F.2d at 192).

In order to prove irreparable harm, the moving party must "demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial."  Acierno, 40 F.3d at 653 (quoting Instant Air Freight Co., 882 F.2d at 801).  "Economic loss does not constitute irreparable harm."  Acierno, 40 F.3d at 653.  "[T]he injury created by a failure to issue the requested injunction must "be of a peculiar nature, so that compensation in money cannot atone for it . . . ." Id.  "The word irreparable connotes that which cannot be repaired, retrieved, put down again [or] atoned for."  Id. (internal citations and quotations omitted).  In addition, the claimed injury cannot merely be possible, speculative, or remote.  Id. at 655.  "More than a risk of irreparable harm must be demonstrated.  The requisite for injunctive relief has been characterized as a 'clear showing of immediate irreparable injury,' or a 'presently existing actual threat; an injunction may not be used simply to eliminate a possibility of a remote future injury.'" Id.  (quoting Cont'l Group, Inc. v. Amoco Chems. Corp., 614 F.2d 351, 358 (3d Cir. 1980)).

Finally, injunctive relief is an available and appropriate remedy to enforce a restrictive covenant.  See e.g., Arch Pers. Care. Prods, L.P. v. Malmstrom, 90 F. App'x 17 (3d Cir. 2003) (affirming district court's grant of injunctive relief to enforce a non-compete agreement).

# IV.  ANALYSIS

## A.      Breach of Contract

The crux of Plaintiff's action is its breach of contract claim against Boutot.  Esquire seeks the issuance of a preliminary injunction restricting Boutot from the ongoing breach of the Agreement.

Under New Jersey law, "to establish a breach of contract claim, a plaintiff has the burden to show that the parties entered into a valid contract, that the defendant failed to perform his obligations under the contract and that the plaintiff sustained damages as a result." Murphy v. Implicito, 920 A.2d 678, 689 (N.J. Super. Ct. App. Div. 2007).

"It is settled law in New Jersey that restrictive covenants are valid in appropriate circumstances." Scholastic Funding Group, LLC v. Kimble, et al., No. 07-557, 2007 WL 1231795 at *4 (D.N.J. 2007) (citing Solari Indus., Inc. v. Malady, 264 A.2d 53, 56 (N.J. 1970)). A non-compete covenant will be "given effect if it is reasonable in view of all the circumstances of the particular case.  It will generally be found to be reasonable where it simply protects the legitimate interests of the employer, imposes no undue hardship on the employee, and is not injurious to the public." Solari, 264 A.2d at 56.  "Beyond that, three additional factors should be considered in determining whether the restrictive covenant is overbroad: its duration, geographic limits, and the scope of the activities prohibited.  Each of those factors must be narrowly tailored to ensure the covenant is no broader than necessary to protect the employer's interest." The Community Hosp. Group, Inc. v. Moore, 869 A.2d 884, 897 (N.J. 2005).

In the instant action, Plaintiff has shown a reasonable probability of success on the merits of its breach of contract claim.  There is no dispute that Boutot and Esquire entered into the

13

Agreement.  Esquire alleges that Boutot breached the Agreement by failing to abide by the non-compete, non-solicitation, and confidentiality provisions of the Agreement.  This Court agrees.

Esquire has alleged a number of instances where Boutot's actions constitute a violation of the Agreement.  Perhaps the most egregious of these violations was the solicitation of Esquire's PPN reporters to become "Charter Members" of MCS's new court reporting division.  Each of these reporters was solicited to join MCS no later than February 2009, in advance of the anticipated expiration date of Boutot's non-compete agreement, and well in advance of the expiration date of his non-solicitation agreement.[8]

---

[8]At oral argument, Defendants argued that "because all [Boutot] did was talk to them about their future prospect of becoming a member of the MCS preferred provider network," (Transcript of Oral Argument, 5/29/09 ("5/28 Tr."), at 9:13-15), the prospective quality of the solicitation discussion insulates Boutot from liability under the non-solicitation agreement.

As a preliminary matter, this Court doubts the veracity of Defendants' assertion that all Boutot did was "talk" to several of Esquire's PPN reporters.  The non-disclosure forms, several of which are signed by PPN reporters, indicate, to the contrary, that Boutot and MCS took active steps to solicit those PPN reporters, and engage them in a working relationship with MCS, in competition with Esquire.  (See Exhibit D, attached to Verified Complaint.)

In support of its argument, Defendants cite a non-binding decision, Brooks Automation v. Blue Chips Tech., 2006 WL 307948 (Mass. Super. Ct. Jan. 17, 2006), for the proposition that Boutot's solicitation of future business constitutes reasonable preparation and does not violate a non-solicitation clause.  In Brooks, however, the defendant privately prepared a competing business, but did not actively market his product, or otherwise engage in competition, until the end of the one-year competition prohibition.  The superior court in Brooks distinguished that situation from the facts before the Second Circuit in DeLong Corp. v. Lucas, 278 F.2d 804 (2d Cir. 1960), a case relied on by the Brooks' plaintiff.  In DeLong, the Second Circuit found that a former employee breached his non-compete agreement by performing engineering work, for an active competitor of his former employer, on a new product that was not yet ready to be marketed.  The facts of DeLong are far more analogous to those of the instant action.  In this case, MCS is an admitted competitor of Esquire.  MCS provides court reporting services in Texas, and is poised to enter the market on a national level.  Moreover, Boutot did not labor privately to begin an independent court reporting services agency; rather, he latched onto an established corporation, steeped in the litigation management services business.

Defendants' prospective solicitation argument is flawed for two additional reasons.  First, the non-solicitation provision of the Agreement clearly prohibits Boutot from even contacting Esquire contacts for the purpose of doing business.  (Exhibit A, attached to the Verified

Esquire is also reasonably likely to succeed on the merits of its breach of contract claim based on the confidentiality provision of the Agreement. Esquire alleges that because MCS operated for nearly thirty years without offering court reporting services, and began to do so only after hiring Boutot, Boutot will inevitably disclose Esquire's confidential and proprietary information. (Plaintiff's Moving Brief at p. 17 (citing E.I. DuPont deNemours & Co. V. American Potash & Chem. Corp., 200 A.2d 428, 435 (Del. Ch. 1964) ("it is impossible to say that all of plaintiff's trade secrets ... are susceptible of being isolated by [the former employee]. One cannot now say that there is no issue as to his ability to avoid drawing on them ....").)

Esquire's trepidation over unwanted disclosure of its confidential and proprietary information is not unfounded. Esquire secured the services of Andrew Reisman, an expert in the field of computer forensics, for the purpose of analyzing activity on Boutot's work computer at Esquire (the "Esquire Laptop"). After conducting his analysis of the Esquire Laptop,[9] Mr. Reisman testified that, in his expert opinion, on November 10, 2008 and November 13, 2008, a targeted group of files containing Esquire and personal Boutot data were copied to two thumb

---

Cont.

Complaint, at ¶ 4.) This broad provision contemplates and disallows Boutot's prospective solicitation. Second, and more important, the record before this Court shows that Defendants intended to launch their competitive court reporting business in advance of the expiration of Boutot's non-solicitation agreement. That Boutot, who was admittedly hired to create the court reporting division at MCS, would have no hand in soliciting Esquire court reporters is doubtful.

[9]In order to perform the analysis, Mr. Reisman created a "forensic image" of the hard drive associated with the Esquire Laptop. (See Reisman Decl., at ¶ 5.) According to Mr. Reisman, "a 'forensic image' of a hard drive is a verifiable copy of all data present on the drive, including both active files and areas of the drive that contain no active files but that nevertheless contain data." (Id.)

drives[10]. (Declaration of Andrew Reisman ("Reisman Decl."), attached to Verified Complaint at ¶ 13.)

The inescapable conclusion from Mr. Reisman's findings, Esquire asserts, is that Boutot has copied confidential Esquire files to thumb drives and has shared the files with MCS, in violation of the Agreement.  This allegation is bolstered by the record before this Court, which includes copies of e-mails that Boutot sent to MCS employees, containing Esquire files.[11] (Exhibit L, attached to the Avallone Cert.)

Defendants' response to Plaintiff's argument is that the Agreement is unenforceable against Boutot, because it is overly broad[12], and is in violation of public policy, as an unreasonable restraint on trade.

The Agreement also restricts Boutot's post-employment activities.  In relevant part, the Agreement purports to restrain Boutot from:

> engag[ing] directly or indirectly in any business (either financially or as a shareholder, employee, officer, partner, independent contractor, owner or in any other capacity calling for the rendition of personal services or acts of management, operation or control) which is competitive with the business of Esquire within a twenty-five (25) mile radius of any of the Esquire offices for or through which Employee provides or provided services for Esquire and/or any area, territory or office to which Employee is or was assigned.

---

[10]A thumb drive, or a USB drive, is an external storage device, which allows copied and stored data to be accessed from other computers.  (Reisman Decl., at ¶ 14.)

[11]Such e-mails include a December 18, 2008 e-mail to an MCS technology department employee, to which Esquire's new client presentation module was attached.  (5/28 Tr. 53:3-6; Exhibit L, attached to Avallone Cert.)

[12]At oral argument, Defendants conceded that the geographic and temporal scope contemplated by the Agreement was, in fact, reasonable because it drew the same boundaries as other non-compete agreements, deemed valid and enforceable in this Circuit.  (5/28 Tr. at 33:15, 22-25.)

(Exhibit A, attached to the Verified Complaint, at ¶ 5.)

The Agreement also restricts Boutot's contact, for purposes of solicitation, with various individuals and entities related, or connected to, Esquire.  (Id. at ¶ 4.)  Finally, the Agreement prohibits Boutot from using or disclosing any confidential information or trade secrets, gleaned during his tenure at Esquire, to anyone, except in the performance of his duties at Esquire.  (Id. at ¶ 3.)

Defendants argue that restricting Boutot from contacting or soliciting Esquire PPN reporters for inclusion in a newly created MCS preferred provider network, constitutes an impermissible restraint on trade.  (See 5/28 Tr. 13:11-19.)  Defendants' argument presumes, and this Court accepts, that these court reporters are not employees of Esquire, but rather are independent contractors, connected to Esquire through membership in the Esquire PPN.  (Id.) Further, Defendants aver that these court reporters are not necessarily exclusive members of the Esquire PPN, and may have relationships to other court reporter networks.  (Id.)

The thrust of Defendants' argument is that the Agreement improperly binds and restrains independent contractors from contracting with MCS to join its network.[13]  This argument is unavailing.  Independent contractors are not restricted from conducting business with MCS or

---

[13]Defendants reference to Zurbrugg Mem'l Hosp. v. Brahin, No. 87-2717, 1988 WL 98536 (D.N.J. 1988), is unhelpful in this Court's consideration of Defendants' argument.  First, the factual analogy to Zurbrugg is absent here, as no defendant in this case is an independent contractor.  Rather, Boutot is a former employee of Esquire.  Moreover, Esquire is not seeking to apply the restrictive covenant to an independent contractor, but rather seeks Boutot's compliance with the Agreement.  Second, unlike Zurbrugg, in this case there is an express, written covenant not to compete.  Even if this Court were to view Zurbrugg as standing for the proposition that a restrictive covenant is unenforceable against a signatory defendant when that covenant tangentially and minimally impacts the ability of independent contractors to conduct business, such a proposition is neither binding, nor persuasive.

joining an MCS preferred provider network.  Esquire has never argued that MCS or its other employees is restricted from directly soliciting court reporters, including Esquire PPN reporters. The Agreement restricts, in the first instance, Boutot's activities and it is not an improper restraint on trade.

Plaintiff has made an adequate showing of likelihood of success on its breach of contract claim.  Esquire has sufficiently established the existence of a valid agreement and a breach of that agreement.  This Court further finds that Esquire has a legitimate interest in enforcing the Agreement, to the extent that nonenforcement could result in financial loss and damage to reputation.  There is also nothing in the record to support the conclusion that a grant of injunctive relief would cause undue hardship to Boutot.  The Agreement is not injurious to the public. Plaintiff is entitled to a preliminary injunction, which restricts Boutot from engaging in actions in violation of the Agreement.

**B.     Misappropriation of Trade Secrets**

For the same reasons discussed above, it is likely that Esquire will prevail on its misappropriation claim.  Esquire alleges that Boutot unlawfully took, disclosed, and used Esquire's confidential and trade secret information.

The basic elements of a trade secrets claim under New Jersey law are: (1) the existence of a trade secret, (2) communicated in confidence by the plaintiff to the employee, (3) disclosed by the employee in breach of that confidence, (4) acquired by the competitor with knowledge of the breach of confidence, and (5) used by the competitor to the detriment of the plaintiff.  Rohm & Haas Co. v. Adco Chem. Co., 689 F.2d 424, 429-30 (3d Cir. 1982).

New Jersey courts have held that trade secrets include customer lists and information

relating to merchandising, costs and pricing.  "In New Jersey, customer lists of service businesses have been afforded protection as trade secrets." Lamorte Burns and Co., Inc. v. Walters, 770 A.2d 1158, 1166 (N.J. 2001).

Plaintiff's customer lists and pricing information constitute trade secrets under New Jersey law.  The record supports the allegation that Boutot acquired confidential knowledge of Esquire's customer lists, pricing information, and other proprietary information; and copied it to solicit customers in developing a competitive court reporting services network for MCS.  (See Supplemental Declaration of Andrew Reisman, ¶ 4 ("An analysis of the April 2009 Thumb Drive [received from Boutot] revealed over 600 files, many of which based on their names appear to be related to Esquire.  Moreover, many of those documents had been accessed after Boutot's departure from Esquire, with access dates between November 2008 and April 2009."); see also 5/28 Tr. 53:3-6; Exhibit L, attached to Avallone Cert.)

Plaintiff has sufficient evidence for this Court to find in its favor on its claim for misappropriation of trade secrets.  Plaintiff has offered sufficient evidence that would show that Boutot conveyed Esquire's trade secrets to MCS.  Thus, this Court finds that Plaintiff is likely to succeed on its claim for misappropriation of trade secrets.

**C.      Tortious Interference with Prospective Economic Advantage**

This Court also finds that Esquire is likely to succeed on its claim against MCS for tortious interference with prospective economic advantage.  To state a claim for tortious interference with prospective economic advantage, a plaintiff must allege: (1) it had a continuing or prospective economic relationship or reasonable expectation of economic advantage; (2) the defendant knew of the relationship or expectation; (3) the interference and harm inflicted were

done intentionally and with "malice," that is, conduct that is wrongful and without justification or excuse; (4) if not for the interference, it was reasonably probable that plaintiff would have realized the economic advantage; and (5) the plaintiff was injured as a result of defendant's conduct.  See Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 186 (3d Cir. 1992) (citing Printing Mart-Morristown v. Sharp Elec. Corp., 563 A.2d 31 (N.J. 1989)); see also Varela v. Hammond, Inc., 94 F.3d 842, 848 (3d Cir. 1996).

In the instant action, MCS had actual knowledge of Boutot's obligations under the Agreement.  (Verified Complaint at ¶ 84.)  Nonetheless, MCS engaged Boutot in employment that competed directly with Esquire, in violation of the Agreement.  MCS also allowed Boutot to violate the confidentiality provision of the Agreement, when Boutot e-mailed Esquire files to fellow MCS employees.  Further, Esquire has shown loss as a result of this tortious interference. (See Exhibits V-Y, attached to Avallone Cert. (asserting that Esquire lost a profitable client, after Boutot relayed an untrue statement about Esquire to that client.).)

## D.    Irreparable Harm

Plaintiff has made a sufficient showing that Defendants are in possession of Plaintiff's confidential and proprietary information.  Esquire has also sufficiently shown that MCS is willing to capitalize on that information, as well as Boutot's experience in the court reporting services business, to compete with Esquire, notwithstanding the Agreement between Boutot and Esquire.  A preliminary injunction is necessary to prevent the harm to Esquire if Boutot and MCS are allowed to proceed unrestrained.[14]  See Pappan Enters., Inc. v. Hardee's Food Sys., Inc., 143

---

[14]See Faiveley Transport Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009) ("A rebuttable presumption of irreparable harm might be warranted in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets to a

F.3d 800, 805 (3d Cir. 1998) ("Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill.")

**E.      Balance of the Hardships**

The third factor that the Third Circuit requires this Court to analyze in its consideration of Plaintiff's preliminary injunction application is balance of the hardships.  In the instant action, the harm to Plaintiff in the absence of the issuance of a preliminary injunction far outweighs the resultant harm to the enjoined Defendants.  MCS operated for nearly thirty years without providing court reporting services.  There is no evidence that MCS' business will be harmed if finite restraints are placed on its ability to grow the fledgling division.

**F.      Public Interest**

This Court also finds that the public interest is served through the issuance of a preliminary injunction.  A preliminary injunction will serve to enforce valid constraints and will protect the confidentiality of Plaintiff's proprietary information and trade secrets, without stifling the court reporting services industry.  See Campbell Soup Co. v. Desatnick, 58 F. Supp. 2d 477, 489 (D.N.J. 1999) (citing Ingersoll-Rand Co. v. Ciavatta, 542 A.2d 879 (1988)) (upholding a restrictive covenant, where the driving purpose behind the restrictive covenant was to protect proprietary information, and not to stifle competition.).

---

Cont.

wider audience or otherwise irreparably impair the value of those secrets.").  Although not the law of this Circuit, there is case law supporting the proposition that a party may be entitled to a presumption of harm where the threat of trade secret disclosure looms.  This Court finds this rationale persuasive and it presents an additional basis for a finding of irreparable harm.

**IV. CONCLUSION**

This Court finds that Plaintiff has shown a likelihood of success on the merits and irreparable harm by Defendants' conduct. Considering these factors together with the potential harm to Defendants and the public interest, all factors weigh in favor of granting Plaintiff's application for injunctive relief.  Plaintiff's application for a preliminary injunction is granted. An appropriate Order is attached.


Date: June 19, 2009

                 S/Joseph A. Greenaway, Jr.           
                 JOSEPH A. GREENAWAY, JR., U.S.D.J.